# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

LISA GUNTER                                    :

          Plaintiff,                   :

                                      Case No. 3:09CV0292

  vs.                                          :

                                      District Judge Timothy S. Black

MICHAEL J. ASTRUE,                   :   Magistrate Judge Sharon L. Ovington
     Commissioner of the Social
     Security Administration,           :

          Defendant.                   :

# REPORT AND RECOMMENDATIONS[1]

## I.  INTRODUCTION

Plaintiff Lisa Gunter sought financial assistance from the Social Security

Administration by applying for Supplemental Security Income ["SSI"] and

Disability Insurance Benefits ["DIB"] on September 26, 2005, alleging disability

since September 9, 2005.  (Tr. 52-54, 329-32).  She claims to be disabled due to

congestive heart failure, chronic obstructive pulmonary disease ["COPD"],

asthma, Bell's palsy, and a heart attack.  (Tr. 65).

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

1

After various administrative proceedings, Administrative Law Judge ["ALJ"] Thomas R. McNichols, II, denied Plaintiff's SSI and DIB applications based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 26-27). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #6), the Commissioner's Memorandum in Opposition (Doc. #8), Plaintiff's Reply (Doc. #9), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision and remand for payment of benefits. The Commissioner seeks an Order affirming the ALJ's decision.

## II. BACKGROUND

Plaintiff, who was born in 1961, was 47 years old at the time of the administrative decision, and thus was considered to be a "younger individual" for purposes of resolving her DIB and SSI claims. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c)[2]; (*see also* Tr. 25, 52). She has a ninth grade, limited education. *See* 20

---

[2]The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding SSI/DIB Regulations.

2

C.F.R. § 416.964(b)(3); (*see also* Tr. 70). Plaintiff has worked in the past as a housekeeper/cleaner and an assembler/production worker. (Tr. 66, 85-92).

Plaintiff testified at the administrative hearing that she stopped working in September 2005 after a heart attack, at which time she had a heart defibrillator implanted. (Tr. 354-55). She felt that she physically was not able to return to work. (Tr. 355). Plaintiff also testified that she is depressed and does not want to be around people because of their reaction to her weight. (Tr. 359).

**Medical Evidence of Record.** The relevant medical evidence of record is summarized as follows:

*Physical Impairments*: Plaintiff was seen in the emergency room on August 18, 2003, with complaints of left arm pain. She reported a history of two heart attacks in 1994. (Tr. 121-32; *see also* Tr. 135). A stress test was negative. (Tr. 128).

On September 10, 2005, Plaintiff was brought to the hospital by ambulance (Tr. 135) and admitted for one week with heart palpitations and chest pressure. (Tr. 133-93). At the hospital, Plaintiff "was cardioverted multiple times and eventually vomited and was intubated. She went [in]to V-fib and was shocked and then went back to her normal sinus rhythm." (Tr. 135). The diagnosis was "[v]entricular tachycardia with sudden cardiac arrest." (Tr. 142).

3

A heart catheterization on September 12, 2005, revealed a markedly enlarged left ventricle and an anterior apical aneurysm with an ejection fraction of 30 percent, as well as a totally occluded LAD [left anterior descending] with recanalization. (Tr. 149-50).  An ejection fraction of 32 percent, "similar to the previous study of 30 percent," and significant myocardial scarring were noted on nuclear imaging on September 13, 2005.  (Tr. 187-88).  On September 16, 2005, Plaintiff had a cardioverter-defibrillator implanted.  (Tr. 152-54).  A post-surgical chest x-ray was negative for acute pulmonary disease.  (Tr. 186).

Plaintiff treated at the Berry Family Health Center from September 29, 2005 through June 24, 2008.  (Tr. 202-10, 291-92, 301-18, 323-28).  She initially was seen following the above hospitalization.  Plaintiff was treated for history of arrythmia, depression, congestive heart failure post status AICD, dyslipidermia, hypertension, and left hip bursitis.  (*Id.*).

Treating physician Heather A. Kleinhenz, M.D., completed a questionnaire for the Ohio Bureau of Disability Determination ["BDD"] on October 25, 2005. (Tr. 199-201).  Dr. Kleinhenz reported that Plaintiff had an episode of sudden cardiac death, ventricular fibrillation, and ventricular tachycardia resulting in implantation of a cardiac defibrillator.  (Tr. 200).  Dr. Kleinhenz also reported Plaintiff's New York Heart Association functional class at III.  (Tr. 201).  She

4

deferred to Plaintiff's cardiologist as to whether stress testing would be contraindicated.  (*Id.*).

Following her heart-related hospitalization, Plaintiff began treating with Mark E. Krebs, M.D., a cardiologist, in October 2005.  (*See* Tr. 278).  Her complaints on her initial visit included occasional sharp chest pain, leg pain, palpitations, and shortness of breath with minimal exertion.  (*Id.*).  Plaintiff's dosage of Metoprolol – a prescription medication for treatment of angina and high blood pressure -- was doubled at that time.  (*Id.*).

In November 2005, Dr. Krebs prescribed nitroglycerin due to Plaintiff's continued complaints of fatigue and shortness of breath.  (Tr. 275).  In December 2005, Dr. Krebs recalibrated Plaintiff's defibrillator and noted that she was stable. (Tr. 272).

After complaining of left arm pain to the Berry Family Health Center, Plaintiff was admitted to the hospital on June 2, 2006, to rule out myocardial infraction.  (Tr. 211-24).  Nuclear imaging revealed a "[s]table abnormal exam," with a "[l]arge apical scar extending into the adjacent anterior and inferior walls," "[n]o definite myocardial ischemia," and a "[l]ow ejection fraction of 30%."  (Tr. 224).

5

On June 27, 2006, Dr. Krebs described Plaintiff's symptoms as consistent with New York Heart Association class III heart failure.  (Tr. 265).  He noted that the ejection fraction on her June 3, 2006 study was 30 percent.  (*Id.*).  Dr. Krebs continued Plaintiff on Metoprolol, increased her Lisinopril,[3] and added a prescription for Zocor to treat her cholesterol levels.  (*Id.*).

On May 8, 2006, state agency physician Kathryn Drew, M.D., determined that the Ohio BDD "cannot order" Plaintiff to undergo an exercise test, "even though [Plaintiff's] T[reating ]S[ource] is willing to do it," because "[c]laimant has numerous conditions which preclude ordering a GXT [graded exercise stress test] for disability purposes."  (Tr. 233).  On July 12, 2006, Dr. Drew reviewed the record and completed a  Residual Functional Capacity Assessment.  (Tr. 225-34).  She found that Plaintiff's "allegations are consistent with the diagnosis, but the severity of the allegations are not supported by MER."  (Tr. 232).  Dr. Drew opined that Plaintiff could occasionally lift/carry up to 20 pounds, frequently lift/carry up to 10 pounds, stand/walk for two hours out of eight, and sit for six hours out of eight.  (Tr. 226).  Plaintiff occasionally could climb stairs, but never could climb ladders, ropes or scaffolding.  (Tr. 227).

---

[3]Lisinopril is described by the American Society of Heath-System Pharmacists as a high blood pressure medication "used in combination with other medications to treat heart failure," and also "to improve survival after a heart attack."  *See* National Center for Biotechnology Information website, http://www.ncbi.nlm.nih.gov/guide (emphasis added).

On October 3, 2006, James Gahman, M.D., another state agency reviewer, affirmed Dr. Drew's opinion.  (Tr. 254).

Dr. Kleinhenz of the Berry Family Health Center reported continued shortness of breath, but otherwise generally normal physical examination findings, for Plaintiff in January, March and August of 2007.  (Tr. 313-18).  Dr. Kleinhenz's treatment notes from January 2, 2007 indicate that Plaintiff was continuing to see Dr. Krebs regularly and that he had added Lipitor to Plaintiff's medications.  (Tr. 316).  Her notes also indicate that Plaintiff was continuing to take Metoprolol and Lisinopril.

Plaintiff saw Marissa C. Ramirez, D.O., another physician at the Berry Family Health Center, on April 7, 2008, "for completion of disability paperwork." (Tr. 302).  Plaintiff complained of back and leg pain, said that she could walk only short distances due to leg pain, and continued to describe shortness of breath on exertion.  (*Id.*).  Her physical examination was normal.  (Tr. 302-03).  Dr. Ramirez prescribed Motrin for pain and recommended weight loss.  (Tr. 303).

In a visit to Dr. Krebs on June 10, 2008, Plaintiff reported exertional dyspnea after walking one block.  (Tr. 319; *see also* Tr. 321).  Dr. Krebs noted that the "[l]ast assessment of [Plaintiff's] left ventricular systolic function from approximately two years ago suggested an ejection fraction of 30% in a setting of

7

a large anterior myocardial infarction." (Tr. 319). He opined that "[t]his finding coupled with her continued weight gain (now 374 pounds) probably in large part accounts for her exertional dyspnea." (*Id.*) (parenthetical in original); (*see also* Tr. 319-22).

*Mental Impairments:* In February 2006, Mary Ann Jones, M.D., examined Plaintiff for the Ohio BDD. (Tr. 194-98). Plaintiff reported that she suffered from depression, crying episodes, and problems dealing with stress. Dr. Jones observed that Plaintiff's facial expressions were sad. She cried throughout the interview. Dr. Jones characterized that Plaintiff's "presenting demeanor" as "defeated, resigned, apathetic, and dysphoric." (Tr. 195). Plaintiff made limited eye contact and was "preoccupied with her own symptomatology and evidence[d] a degree of confusion." (*Id.*). Dr. Jones also noted that Plaintiff was "distracted with regard to her degree of consciousness" and was inconsistent in her understanding of questions. (*Id.*). She could not follow instructions consistently. (*Id.*). Plaintiff's insight and judgment was good. (*Id.*). Dr. Jones found that Plaintiff's "quality of life" could be characterized "as inactive, routine, and unfulfilled." Dr. Jones diagnosed Plaintiff with major depression and assigned her a Global Assessment of Functioning ["GAF"] score of 55. (Tr. 197). Dr. Jones opined that Plaintiff was moderately impaired in her ability to relate to

others and to remember, carry out and follow instructions.  Her ability to deal with work stress also was moderately impaired, and her ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks was mildly impaired.  (Tr. 97-98).

Gloria Ross, Ph.D., became Plaintiff's treating psychologist on February 22, 2006, on referral from Dr. Kleinhenz.  Plaintiff reported that having her defibrillator go off unexpectedly was her greatest fear.  Dr. Ross diagnosed general anxiety disorder, social anxiety and depression.  Dr. Ross opined that Plaintiff had no impairment in her activities of daily living.  According to Dr. Ross, Plaintiff responded little to treatment, although medication made her cry less often.  She also lacked insight concerning her anxiety and depression.  Her prognosis was deemed weak.  (Tr. 284).

As to Plaintiff's abilities to do work-related activities, Dr. Ross opined that Plaintiff had poor to no ability to deal with the public and relate predictably in social situations.  She had fair – meaning seriously limited but not precluded -- ability to relate to co-workers, use judgment, deal with work stresses, function independently, maintain attention/concentration, behave in an emotionally stable manner, demonstrate reliability, and understand, remember and carry out

complex job instructions.  (Tr. 285-87).  A "mini" mental status exam administered that day yielded a score of 27 out of 30.  (Tr. 288).

On June 21, 2007, Dr. Ross found that Plaintiff's affect was much better since starting therapy.  She was noted to be healthier since she started swimming. (Tr. 311).

## III.  THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A.  <u>Applicable Standards</u>

To be eligible for SSI or DIB, a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).  A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see also Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992), *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. (*See* Tr. 17-18); *see also* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**B.      The ALJ's Decision**

11

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through December 21, 2010, and has not engaged in substantial gainful activity since September 2005. (Tr. 19).

The ALJ found at Step 2 that Plaintiff has the severe impairments of cardiac conditions (history of acute myocardial infarction associated with arrhythmia and congestive heart failure, coronary artery disease, and pacemaker implant); obesity; bilateral knee arthritis; and depression.  (*Id.*).  The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meet or equal the level of severity described in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 21).

At Step 4, the ALJ found that Plaintiff retained the residual functional capacity ["RFC"] to perform a limited range of sedentary work with the following restrictions:  lifting up to 10 pounds; standing/walking limited to a combined total of two hours in an eight-hour workday; must avoid climbing ropes, ladders and scaffolds, or more than occasional climbing of stairs; no repetitive use of foot controls; and must avoid exposure to hazards, temperature extremes/humidity, irritants in the air and magnetic fields.  (Tr. 21).  Plaintiff was mentally limited to having no direct dealing with the public.  (*Id.*).  The ALJ

12

further found that Plaintiff is unable to perform her past relevant work as an assembler.  (Tr. 25).  This assessment, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for SSI or DIB.  (Tr. 26-27).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at

407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's

legal criteria, may result in reversal even if the record contains substantial

evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Soc. Sec.*, 582

F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by

substantial evidence, 'a decision of the Commissioner will not be upheld where

the SSA fails to follow its own regulations and where that error prejudices a

claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*,

582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v.

Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.   DISCUSSION

### A.   The Parties' Contentions

Plaintiff contends that the ALJ erred at Step 3 of the sequential evaluation

by finding that she did not meet the criteria for chronic heart failure set forth at

Listing 4.02.  (Doc. #6 at 8-10).  This argument is potentially dispositive since a

finding in favor of Plaintiff at Step 3 would have streamlined the ALJ's

evaluation.  *See Combs v. Comm'r. of Soc. Sec.*, 459 F.3d 640, 649 (6th Cir. 2006) (*en

banc*).  An adult whose impairments meet or equal the criteria of a Listing is

14

presumed be under a disability and is granted benefits without further evaluation. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

Plaintiff further argues the ALJ erred in rejecting findings of Plaintiff's treating physicians and psychologist that, according to Plaintiff, would support a conclusion that Plaintiff is disabled by the combination of her physical and mental impairments. (Doc. #6 at 10). Plaintiff urges that the ALJ's errors in these regards mandate a reversal of the ALJ's decision for an award of benefits.

The Commissioner argues that the ALJ did not err at Step 3 and that substantial evidence supports the ALJ's determination that Plaintiff did not meet the criteria for Listing 4.02. (Doc. # 8 at 8). Defendant also argues that the ALJ correctly weighed the medical source opinions and reasonably determined Plaintiff's RFC. (*Id.* at 10).

**B.      The Listing and the ALJ's Findings**

Plaintiff had the burden at Step 3 to show that her impairments met or equaled the criteria of a specific Listing. *See Sullivan*, 493 U.S. at 530-31. The United States Court of Appeals for the Sixth Circuit explains:

> At step three, the SSA [Social Security Administration] examines the severity of claimants' impairments but with a view not solely to their duration but also to the degree of affliction imposed . . . Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of

15

> impairments, or that is at least equal in severity to those
> listed . . .  The list identifies and defines impairments
> that are of sufficient severity as to prevent any gainful
> activity . . .  A person with such an impairment or an
> equivalent, consequently, necessarily satisfies the
> statutory definition of disability. For such claimants, the
> process ends at step three.

*Combs*, 459 F.3d at  643 (citing, in part, *Sullivan*, 493 U.S. at 532) (other citations

omitted).

The Listing at issue in the present case – Listing 4.02 – required Plaintiff to

present evidence to establish that she meets or equals the following criteria:

> *Chronic heart failure* while on a regimen of prescribed
> treatment, with symptoms and signs described in
> 4.00D2.  The required level of severity for this
> impairment is met when the requirements in *both A and
> B* are satisfied.
>
> A.    Medically documented presence of one of the
> following:
>
> 1. Systolic failure (see 4.00D1a(I)), with left ventricular
> end diastolic dimensions greater than 6.0 cm or ejection
> fraction of 30 percent or less during a period of stability
> (not during an episode of acute heart failure);
>
> * * *
>
> AND
>
> B.    Resulting in one of the following:
>
> 1. Persistent symptoms of heart failure which very
> seriously limit the ability to independently initiate,

16

> sustain, or complete activities of daily living in an
> individual for who an MC, preferably one experienced
> in the care of patients with cardiovascular disease, has
> concluded that the performance of an exercise test
> would present a significant risk to the individual[.]
>
> * * *

Listing of Impairments § 4.02, 20 C.F.R. Part 404, Subpart P, Appendix 1.

    The ALJ found that Plaintiff's cardiac conditions did not meet or equal

Listing 4.02, reasoning as follows at Step 3:

> Section 4.02 was reviewed (chronic heart failure). There
> is no evidence that the claimant is on prescribed
> medication for such condition. High blood pressure
> and high cholesterol medications are prescribed in
> general, and she was told by Dr. Krebs to take aspirin as
> well. There is no evidence of a specific medication
> regimen for heart failure. The claimant's heart was
> markedly enlarged at the episode in September 2005,
> but there are no diagnostic tests documented showing
> this thereafter. Her left ejection fraction was 30% at that
> time and reportedly again on testing in June 2006.
> However, the BDD reviewed this evidence and noted
> that the treating source in June 2006 reported it to be
> 40%. There is no evidence that the claimant is
> precluded by a cardiologist in performing an exercise
> stress test. Essentially, the BDD physicians had all this
> evidence to review and concluded that she could do a
> light range of work, and there was no finding of
> meeting or equaling listing-level severity. There is
> nothing in the subsequent record to show any
> worsening of her condition.

(Tr. 21).

17

**C.      Analysis**

In his Step 3 analysis, the ALJ expressly relied on a single notation from state agency reviewing physician Dr. Drew for his conclusion that a treating source reported that Plaintiff had a 40 percent ejection fraction in June 2006.  (Tr. 21); *(see* Tr. 232) ("TS reports 6/06 EF 40%").  An ejection fraction reading in excess of 30 percent would disqualify Plaintiff from satisfying Listing 4.02(A)(1)'s specific criteria.

Despite a thorough review of the record, this Court has found no medical records or opinion from any physician suggesting that Plaintiff has had a 40 percent ejection fraction at <u>any</u> time since her proposed disability onset date.  To the contrary – and as the ALJ himself acknowledged in his Step 3 analysis (*see* Tr. 21) – the June 2006 nuclear imaging performed on Plaintiff's heart revealed a "[l]ow ejection fraction of 30%."  (Tr. 224).  Moreover, treating cardiologist Dr. Krebs accurately reported that 30 percent ejection fraction reading from June 2006 in both his June 27, 2006 report (noting "an ejection fraction of 30% as documented in . . . her perfusion study from 6/3/06") (Tr. 265), and in his June 10, 2008 report (referring to Plaintiff's "[l]ast assessment . . . from approximately two years ago" as "suggest[ing] an ejection fraction of 30%").  (Tr. 319).

18

Absent any indication elsewhere in the record substantiating Dr. Drew's notation that "TS reports 6/06 EF 40%" (Tr. 232) – apparently construed by ALJ McNichols to mean that a "T[reating ]S[ource] report[ed in] 6/06 [that Plaintiff had an] E[jection ]F[raction of] 40%" – it appears that such isolated notation not attributed to a specific doctor either was a typographical error or reflects Dr. Drew's mistaken reading of Dr. Krebs' reports.

In either case, given the ALJ's reliance on the BDD physician's apparently incorrect assessment of the record, Dr. Drew's opinion does not constitute substantial evidence supporting the ALJ's Step 3 finding that Plaintiff did not satisfy the first half of the criteria for Listing 4.02. (*See* 4.02(A)(1), "systolic failure, with . . . ejection fraction of 30 percent or less during a period of stability"). The ALJ's finding in that regard thus cannot be sustained.

In addition, the ALJ also erred in finding that "no evidence" showed that Plaintiff is precluded from "performing an exercise stress test" (Tr. 21), as necessary to satisfy Listing 4.02(B)(1). That portion of the Listing 4.02 criteria is satisfied if "an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual." *Id.* The applicable regulations define "an MC," or "medical consultant," in pertinent part, as "a

19

person who is a member of a team that makes disability determinations in a State agency." 20 C.F.R. § 404.1616(a).

Here, Dr. Drew, as an Ohio BDD agency reviewer, surely qualifies as "an MC" for purposes of Listing 4.02(B)(1). In analyzing Plaintiff's case on May 8, 2006, Dr. Drew explicitly found that Plaintiff "has numerous conditions which preclude ordering a GXT for disability purposes." (Tr. 233). Although the record does not disclose Dr. Drew's medical specialization, the regulations state only a "prefer[ence]," not a requirement, that the finding be made by a State agency physician "experienced in the care of patients with cardiovascular disease." Listing 4.02(B)(1). Moreover, Dr. Drew's conclusion was consistent with the provisions of Listing 4.00(C)(8)(iii), which specifies that the Social Security Administration will not subject a claimant to an exercise test if "an MC" has determined that he or she has "[a]n implanted cardiac defibrillator."

To the extent that ALJ McNichols presumed that a finding against an exercise test must be made "by a cardiologist" (*see* Tr. 21) in order to satisfy Listing 4.02(B)(1), he erred by apparently applying a legal standard inconsistent with the actual language of the applicable Listing. *See Blakley*, 581 F.3d at 406. Alternatively, to the extent that the ALJ's conclusion was founded on simply overlooking Dr. Drew's opinion that the State agency was precluded from

20

"ordering a GXT" (Tr. 233), his conclusion is not supported by substantial evidence. *See id*. In either case, his conclusion to that effect cannot be sustained.

The Commissioner nonetheless contends that Plaintiff has failed to show that she meets Listing 4.02 because she has not demonstrated that she is under "a regimen of prescribed treatment," as required, *see* Listing 4.02, or that she satisfies Listing 4.02(B)(1)'s requirement of "persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain or complete activities of daily living." (Doc. #8 at 9). More specifically, Defendant urges that Plaintiff "makes no effort to contradict the ALJ's finding that there was 'no evidence that [she] is on prescribed medication'" for chronic heart failure. (*Id.*, quoting Tr. 21).

As noted above, however, Plaintiff has been in treatment for her cardiac impairments consistently since at least September 2005. Following her initial ventricular tachycardia with sudden cardiac arrest in September 2005, she has treated with cardiologist Dr. Krebs approximately every six months, and with one of his treating nurse practitioners every three months. (Tr. 255-83, 295-96, 319-22). In follow-up to the implantation of Plaintiff's pacemaker, Dr. Krebs in October 2005 increased her Metoprolol (a beta-blocker used to treat angina [chest pain] and hypertension). (Tr. 278). In November 2005, Dr. Krebs prescribed

21

nitroglycerin. (Tr. 275). In December 2005, Dr. Krebs recalibrated Plaintiff's defibrillator. (Tr. 272). In June 2006, Dr. Krebs noted that Plaintiff's symptoms were consistent with class III heart failure, increased her Lisinopril – a drug used specifically "to treat heart failure" (*see* n.3, *supra*), in contravention of Defendant's argument (*see* Doc. #8 at 9) and the ALJ's faulty conclusion (*see* Tr. 21) – and added Zocor to her medications. (Tr. 265). Dr. Kleinhenz's notes from January 2, 2007 also indicate that Dr. Krebs at some point added Lipitor to Plaintiff's medications. (Tr. 316). In light of this evidence, the Court fails to see how Plaintiff could be considered <u>not</u> to have been on a regimen of prescribed treatment for her heart condition.

Finally, although Defendant urges that Plaintiff did not prove Listing 4.02(B)(1)'s requirement of "persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain or complete activities of daily living" (Doc. #8 at 9), the ALJ's decision clearly was not premised on any failure of proof in that regard. (*See* Tr. 21). The ALJ specifically acknowledged that "congestive heart failure" was among the cardiac conditions constituting Plaintiff's severe impairments. (Tr. 19). Plaintiff gave testimony describing how her heart symptoms seriously impeded her activities of daily living. (Tr. 355-58, 362-70). Two of Plaintiff's treating physicians reported her New York Heart

Association functional class to be at level III (Tr. 201, 265), a classification indicative of "fatigue, palpitation, dyspnea or anginal pain" being caused by "[l]ess than ordinary activity."  (*See* Doc. #9 at 3).[4]  Indeed, the only significant evidence to the contrary appears to be reviewing physician Dr. Drew's assessment of Plaintiff's physical limitations as being "consistent with the diagnosis," but their "severity" as being "not supported by MER."  (Tr. 232, Tr. 226-27).  Given the otherwise discredited nature of Dr. Drew's opinion, however, that conflicting evidence may be considered of little value.

For the above-stated reasons, the ALJ erred in his consideration of Plaintiff's ability to meet or equal the criteria of Listing 4.02.  As a result, the ALJ's conclusion that Plaintiff's cardiac conditions do not satisfy Listing 4.02 must be vacated.  Analysis of Plaintiff's remaining claims therefore is unnecessary.

## VI.   AN AWARD OF BENEFITS IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to

---

[4]Citing http://www.americanheart.org/persenter.jhtml?identifier=4569, the American Heart Association website.

affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).

"A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) (citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985)). This case presents one of the rare instances in which that standard is met.

The only evidence cited in the ALJ's decision as preventing Plaintiff from satisfying the criteria of Listing 4.02(A) was the agency reviewing physician's apparently erroneous notation suggesting that an unidentified treating source had reported in June 2006 that Plaintiff had a 40 percent ejection fraction. (Tr. 21; *see* Tr. 232). Conversely, the record clearly demonstrates that nuclear imaging of Plaintiff's heart on June 3, 2006, in fact showed that Plaintiff had an ejection fraction of only 30 percent (Tr. 224), and that Plaintiff's treating cardiologist accurately recited that 30 percent ejection fraction finding in both June 2006 (Tr. 265) and June 2008. (Tr. 319). As such, the evidence overwhelmingly proves that Plaintiff satisfied Listing 4.02(A)(1)'s requirement of an ejection fraction of 30 percent or less during a period of stability.

24

Additionally, the ALJ's finding that Plaintiff did not satisfy Listing 4.02(B)(1)'s requirement of an agency physician-ordered prohibition on exercise testing was premised solely on the ALJ's conclusion that no "cardiologist" had precluded Plaintiff from "performing an exercise stress test." (Tr. 21). That conclusion, however, either was derived from the application of an improper legal standard, lacks substantial evidentiary support, or both. Listing 4.02(B)(1) does not require that a cardiologist make such a finding. Listing 4.00(C)(8)(iii) specifically provides that a claimant with "[a]n implanted cardiac defibrillator" will not be required to perform an exercise test. And State agency physician Dr. Drew expressly found both that Plaintiff had an implanted cardiac defibrillator and that her conditions "preclude ordering a GXT for disability purposes." (Tr. 233). The fact that the ALJ himself found "pacemaker implant" to be among Plaintiff's severe impairments (Tr. 19) further conclusively demonstrates that Plaintiff was exempted under the Social Security Administration's own guidelines from being ordered to perform an exercise test (*see* Listing 4.00(C)(8)(iii)), and thus satisfied Listing 4.02(B)(1).

The additional finding, *supra*, that overwhelming evidence confirms that Plaintiff was "on a regimen of prescribed treatment" as contemplated by Listing 4.02 (*see* Tr. 255-83, 295-96, 319-22; Tr. 316; *see also* n.3, *supra*) – notwithstanding

25

the ALJ's unsupported conclusion that Plaintiff was not on "a specific medication regimen for heart failure" (*see* Tr. 21) – leaves no doubt that Plaintiff conclusively has shown that her condition meets or equals all of the criteria of Listing 2.04.

Accordingly, this Court concludes that a judicial award of benefits is warranted, and that this matter should be remanded to the Commissioner and the ALJ only for purposes of paying that award.

**IT THEREFORE IS RECOMMENDED THAT**:

    1.    The Commissioner's non-disability finding be REVERSED;

    2.    This case be REMANDED to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for payment of SSI and DIB consistent with the Social Security Act; and

    3.    The case be TERMINATED on the docket of this Court.

June 28, 2010                        __s/Sharon L. Ovington____

                                       Sharon L. Ovington
                                       United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen [14] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen [17] days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen [14] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Am*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).